| | |
|---|---|
| RENE MICHELI<br><br>       <u>Plaintiff,</u><br><br>    v.<br><br>TECHTRONIC INDUSTRIES, CO, LTD.,<br>TECHTRONIC INDUSTRIES NORTH AMERICA,<br>INC., ONE WORLD TECHNOLOGIES, INC., and<br>RYOBI TECHNOLOGIES, INC.,<br><br>       <u>Defendants.</u> | CIVIL ACTION NO. 11-10503-NMG |
| OLEG MAZIN<br><br>       <u>Plaintiff,</u><br><br>    v.<br><br>TECHTRONIC INDUSTRIES, CO, LTD.,<br>TECHTRONIC INDUSTRIES NORTH AMERICA,<br>INC., ONE WORLD TECHNOLOGIES, INC., and<br>RYOBI TECHNOLOGIES, INC.,<br><br>       <u>Defendants.</u> | CIVIL ACTION NO. 11-10717-FDS |
| JAKE GAO<br><br>       <u>Plaintiff,</u><br><br>    v.<br><br>TECHTRONIC INDUSTRIES, CO, LTD.,<br>TECHTRONIC INDUSTRIES NORTH AMERICA,<br>INC., ONE WORLD TECHNOLOGIES, INC., and<br>RYOBI TECHNOLOGIES, INC.,<br><br>       <u>Defendants.</u> | CIVIL ACTION NO. 11-10718-NMG |

REPORT AND RECOMMENDATION ON
THE DEFENDANT TECHTRONIC INDUSTRIES, CO.'S
<u>MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION</u>

August 22, 2012

SOROKIN, C.M.J.

The defendant Techtronic Industries, Co. ("TTI") has moved to dismiss actions filed by

Jake Gao, Rene Micheli, and Oleg Mazin (collectively, "the Plaintiffs") for lack of personal

jurisdiction.[1]  For the reasons that follow, I recommend that the Court grant these motions.

I.      Procedural Posture and Plaintiffs' Request to Delay Resolution of the Motion

Fact discovery in all three of these cases has concluded.  Except for the completion of the

expert discovery (which the parties are resolving in a cooperative manner), the cases are ready for

trial.  They have been so ready for a period of time.  When the Plaintiffs succeeded in serving TTI

in 2011, TTI had already filed motions to dismiss for lack of subject matter jurisdiction in several

related matters in this district.  Document No. 14, at 2.[2]  The parties agreed to stay the deadline

---

[1]  TTI originally moved to dismiss actions filed by six different plaintiffs.  <u>Gao v. Techtronic Industries Co., et al.</u>, No. 11-10718-NMG, at Document No. 20; <u>Mazin v. Techtronic Industries Co., et al.</u>, No. 11-10717-FDS, at  Document No. 21; <u>Micheli v. Techtronic Industries Co., et al.</u>, No. 11-10503-NMG, at  Document No. 24; <u>Romero v. Techtronic Industries Co., et al.</u>, No. 09-11955-NMG, at  Document No. 26; <u>Chatteron v. Techtronic Industries Co., et al.</u>, No. 09-10922-NMG, at  Document No. 22; <u>Burke v. Techtronic Industries Co., et al.</u>, No. 09-10797-NMG, at  Document No. 21.  Since then, the parties have stipulated to the dismissal of the Complaints in <u>Chatteron</u>, <u>Romero</u>, and <u>Burke</u>.  In the three remaining actions, the parties have stipulated to the dismissal of the claims against Ryobi Technologies, Inc. only.  The briefing in the remaining actions is nearly identical.  This Report and Recommendation therefore addresses all three motions to dismiss.

[2]  To limit the number of citations throughout this Report and Recommendation, I only reference the docket entries in <u>Micheli</u>, unless otherwise indicated.  The exhibits with numerals, e.g. Ex. 1, refer to documents at Document Numbers 26 and 27 of <u>Micheli</u>.  In lieu of posting some documents to the docket in <u>Micheli</u>, the parties instead reference documents previously posted to the docket in <u>Burke</u>.  For this reason, the exhibits with letters, e.g. Ex. A, refer to

for TTI to answer the complaints pending the outcome of its motion to dismiss in those matters. Id. at 2-3.  The Court ultimately terminated the motions to dismiss in the related matters, subject to renewal after the parties completed jurisdictional discovery on an identical motion in a similar California case.  Burke, Document No. 35, at 2.  Some discovery was had in California, but less discovery than the Plaintiffs sought; ultimately, TTI was dismissed without opposition in the California case.  Document No. 32-1, at 1-2; Document No. 32-2, at 1.  In the meantime, the jurisdictional discovery battle moved to another similar case confronting an identical motion in New Jersey.  Document No. 26-4.  The plaintiffs in New Jersey claim that TTI has failed to answer interrogatories, despite a court order to do so, and has produced no documents, notwithstanding an order to supplement to some extent its discovery.  Document No. 26-5, at 1-2. These claims, TTI's response and a motion for additional time to complete jurisdictional discovery are all pending before the federal court in New Jersey.  While all of that was occurring, the parties, pursuant to a previously established schedule in this district, briefed the motion to dismiss in this district based upon the existing state of the discovery.

At no time did any of the Plaintiffs, pending resolution of the outstanding discovery issues in New Jersey, (1) seek leave to pursue the jurisdictional discovery here; (2) move to stay or to defer the briefing of the renewed motion to dismiss; or (3) move to defer the hearing on the motions as filed.  At this point, the parties have invested substantial effort in briefing the motions and the Court has invested substantial effort in reviewing and considering the motions. Accordingly, I decline to delay resolution of these motions.  To do otherwise would effectively stay these cases for an unknown period of time while the parties completed discovery in New

---

documents at Document Numbers 27 and 30 of Burke.

Jersey and then a further period of time for rebriefing and reargument.

II.      Statement of Facts

    A.      The Standard

        In opposing a motion to dismiss for lack of personal jurisdiction, the plaintiff "ultimately bears the burden of persuading the court that jurisdiction exists."  Cossaboon v. Me. Med. Ctr., 600 F.3d 25, 31 (1st Cir. 2010) (quotation marks omitted).  A district court applies either a *prima facie*, a "preponderance of the evidence," or a "likelihood" standard when reviewing such motions.  Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 677-78 (1st Cir. 1992).  The latter two standards only apply if an evidentiary hearing was held.  Cossaboon, 600 F.3d at 31.  In their briefing, neither party requested an evidentiary hearing.  Document Nos. 25, 26.  Nor do evidentiary disputes or the interests of fairness necessitate one.  Boit, 967 F.2d at 676.  The Plaintiffs here must therefore make a *prima facie* showing that the Massachusetts courts may properly exercise personal jurisdiction over TTI.  See id.

        A *prima facie* showing requires the plaintiff to "proffer[] evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction."  Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008).  To make this showing, "the plaintiff ordinarily cannot rest upon the pleadings but is obliged to adduce evidence of specific facts."  Id. (quotation marks omitted).  The district court does not act as fact-finder under this standard.  Boit, 967 F.2d at 675.  Rather, "[t]he court must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the *prima facie* jurisdictional showing and construe them in the light most congenial to the plaintiff's jurisdictional claim."  Phillips, 530 F.3d at 26 (citations and quotation marks omitted).  The court also considers "facts put forward by

4

the defendants, to the extent that they are uncontradicted." <u>Cossaboon</u>, 600 F.3d at 31 (quotation

marks omitted). In the factual summary that follows, I have therefore supplemented the

Plaintiffs' *prima facie* showing with additional facts that TTI has documented properly.

      B.    The Facts

      TTI is a corporation organized under the laws of Hong Kong, where it is also domiciled.

Document No. 25-1, at ¶3. TTI neither owns nor leases real property located in Massachusetts.

<u>Id.</u> It has no Massachusetts telephone number, mailing address, bank account, or taxpayer

identification number. <u>Id.</u> at ¶4. TTI does not hold any Massachusetts licenses. <u>Id.</u> TTI has

never had any employees, servants or agents in Massachusetts. <u>Id.</u> at ¶5. TTI is a publicly-traded

company, with stock listed on the Hong Kong Stock Exchange and the US OTC. Ex. 0, at 1.

      TTI is the parent corporation for TTI-NA and One World ("the domestic subsidiaries,"

including Ryobi also). Document No. 25-1, at ¶2. TTI owns 98.4% of the shares of TTI-NA. <u>Id.</u>

Techtronic Outdoor Products Technology, Ltd. owns the remaining shares. <u>Id.</u> One World is a

wholly-owned subsidiary of TTI-NA. <u>Id.</u> Before the table saws purportedly injured the

Plaintiffs,[3] a subsidiary of One World, Ryobi, merged into its parent company. <u>Id.</u> One World

assumed all of Ryobi's assets and liabilities in the merger. <u>Id.</u> One World and TTI-NA each have

an issued and fully paid share capital of ten dollars. Ex. P, at 137, 139. One World has sufficient

insurance to cover any potential liability that may arise out of this litigation, as well as sufficient

assets to satisfy any applicable self-insured retention associated with these policies. Document

---

    [3] A Ryobi model saw purportedly injured Gao on November 24, 2009 (<u>Gao</u>, Document
No. 1, at  at ¶34), Micheli on January 22, 2010 (<u>Micheli</u>, Document No. 1, at ¶34), and <u>Mazin</u> on
March 22, 2010 (<u>Mazin</u>, Document No. 1, at ¶34). Ryobi merged into One World in December
2004.

No. 25-2 , at ¶4-5.

TTI serves as the intermediary between One World and third-party, Asian-based manufacturers. Document No. 25-1, at ¶6. Either internally or at the request of The Home Depot (a customer of One World), One World originates orders for table saws, including the Ryobi models that purportedly injured the Plaintiffs. Document No. 25-2, at ¶7. Through these orders, One World determines the quantity and type of table saws to be produced. Id. The orders also direct the manufacturers to ship the finished saws to particular destinations in the United States. Id. The Chief Financial Officer for TTI-NA, Kenneth Faith, affirms that "TTI does not approve, reject, enlarge, contract, or otherwise modify the orders set by One World" once they become final. Id. at ¶1, 8

TTI places One World's orders with the manufacturers, which then produce the table saws according to design specifications provided by One World. Id. at ¶8. The manufacturers deliver the saws to a port in China, where either One World or The Home Depot takes title to and possession of the table saws. Id. at ¶9-10. TTI never takes physical custody or possession of them. Id. at ¶9. Once the saws are deposited at a port in China, One World or The Home Depot assume the risk of loss. Id. at ¶10. There is no evidence that the orders that TTI places on behalf of One World identify the ultimate destination of the saws in the United States. One World sets this location. Id. at ¶9.

Throughout these transactions, One World and TTI maintain financial separation. Id. at ¶9. As soon as TTI purchases the saws from the manufacturers, One World reimburses TTI and pays a transaction fee. Id.

In addition to placing orders with Asian manufacturers, TTI facilitates communications

between the domestic subsidiaries in North America and the Asian manufacturers. Document No.

25-1, at ¶6. Some of the exchanges show that TTI relays cost estimates between these entities;

others show that TTI facilitates the exchange of design and production communications. There is

evidence in the record[4] that shows that such exchanges occurred regularly, including:

- an email from a Ryobi employee to a TTI employee, <u>see</u> Ex. E[5], stating that, "[f]rom what I understand about the TTI/OWT documentation process, your group creates the CCDR and sends it to us so we have all the information we need to complete the ECR," Ex. D;

- an email exchange in which a TTI employee responds to a Ryobi employee's request

---

[4] The Plaintiffs proffer emails and other documents as evidence of TTI's involvement in the design and production of saws. I have carefully reviewed these exhibits against the factual statements in their opposition memorandum. Document No. 26, at 6-11. Because some of the factual statements stretch the contents of the underlying exhibits considerably, I decline to credit them verbatim. <u>See</u> <u>Boit</u>, 967 F.2d at 675 (explaining that "plaintiffs may not rely on unsupported allegations in their pleadings to make a prima facie showing of personal jurisdiction"). For example, the Plaintiffs describe the redesign of a saw model as "largely supervised by [an employee at TTI]." Document No. 26, at 7. Yet the emails proffered in support instead show that a TTI employee provided cost estimates for changes that a Ryobi employee "want[ed] to implement," Ex. D-E, and that Ryobi employees included this same TTI employee on an email proposing a design change. Ex. F. Similarly, the Plaintiffs claim that TTI employees "direct[ed] Ryobi USA personnel to contact the finance department concerning the costs of changes to table saws." Document No. 26, at 11. In the email relied on in support, however, a TTI executive merely asks that a Ryobi employee "[d]o me a favor and shoot finance a copy [of cost estimates that a TTI employee prepared at the request of a Ryobi employee] so they are on board" before an upcoming meeting. Ex. 11. The TTI executive went on to explain that he could not do so because he does not "have their addresses in [his] book." <u>Id.</u> The email stops far short of evidencing hierarchical control. <u>See id.</u> Indeed, there is no evidence in the record that employees at the domestic subsidiaries seek authorization from TTI employees before implementing changes.

[5] Most of the emails in the record contain email addresses that reveal the senders and the recipients' employers. Some also contain signature blocks that provide more specific information, including the senders' job titles and office locations. A few emails obscure the email addresses, making cross-references to other emails necessary in order to ascertain the employers. Furthermore, because TTI-NA and Ryobi employees use the same email address, i.e. ttigroupna.com, I cannot always distinguish between these subsidiaries and, where appropriate, refer to them as the domestic subsidiaries instead.

that he "confirm the cost and lead time to implement several changes" to saw model by providing estimates, Ex. E, Ex. 11;

- an email from a TTI employee to a Ryobi employee explaining why manufacturer scrapped modifications to mould for saw rack,  Ex. H;

- an email from a TTI project manager in Taiwan to a TTI-NA engineer describing his observations of saw prototype following a visit to the fabricator that prepared it, Ex. J;

- an email from an engineer at a domestic subsidiary to a "[t]eam," comprised of employees at both TTI and its subsidiaries, attaching new checklist for implementing regulatory standard and requesting that TTI employees "share" the checklist with vendors, Ex. 2;

- an email from an engineer at a domestic subsidiary to TTI employees asking whether they have "reviewed the checklist [for implementing new regulatory standard] with the 2 vendors" and emphasizing that he "will probably need YOUR HELP in helping them fill out the checklist," Ex. 1 (emphasis in original);

- an email exchange addressing customer returns in which a TTI-NA engineer asks a TTI engineer to confirm whether a manufacturer is using packaging label and the TTI engineer checks with the manufacturer in response, Ex. 5;

- an email from a TTI employee to Ryobi employees stating that a manufacturer is reviewing possible parts substitution and attaching comments from the manufacturer addressing "[c]ost improvement issues," Ex. 6;

- an email from an employee of a domestic subsidiary asking TTI employees to confirm whether "mak[ing] production" is possible if design change implemented, Ex. 10.

During most of these exchanges, TTI serves as an intermediary through which the domestic subsidiaries in North America and Asian manufacturers exchange information.  At times, TTI is bypassed.  Employees of a Taiwanese manufacturer and TTI-NA have exchanged emails regarding cost estimates for and design changes to a saw model.  Ex. I, J.  At other times, customers contact TTI directly: an email in the record shows that an engineer at Sears, Roebuck and Co. in the United States emailed TTI regarding design questions.  Ex. N.

In one email exchange, TTI and TTI-NA employees makes TTI's intermediary role

especially clear.  A TTI employee initiated the exchange by forwarding an email from an Asian manufacturer, in which the manufacturer asks to ship additional saws to the United States before a new regulation becomes effective.  Ex. 8.  The regulation could cause customs in the United States to reject the shipment.  In a follow-up email, the TTI employee asks to ship "at least half of [the manufacturer's] stock to Anderson [, South Carolina]."  Id.  A TTI-NA employee responds by explaining that The Home Depot already has too many saws and that he "wish[es] he could do more but [The Home Depot] is simply not willing to expand their inventory at this time."  Id.  To encourage The Home Depot to take on additional inventory, the TTI employee then proposes that The Home Depot drop the saw's price as a promotion, with the manufacturer, TTI, and The Home Depot splitting the difference.  Id.  The TTI employee explains that he already persuaded the manufacturer to reduce its price, provided the saws are shipped within a week or two.  Id.  The TTI-NA employee replies that he "got more traction on this then [sic] I thought . . . but no resolution" and that he "will push for an answer tomorrow."  Id.  In the final email in the exchange, the TTI employee requests that the TTI-NA employee "[l]et [him] know if we need to ask [the manufacturer] for a bit more [of a price] reduction."  Id.

In a few instances, TTI employees have also played a more active role in the design process and production management.  Evidence of these exchanges includes:

- an email from a TTI employee identifying the location of a sample table saw in Anderson, South Carolina at the request of an employee at domestic subsidiary working to open project testing the saw model, Ex. 3;

- a trip report by employee at domestic subsidiary, see Ex. 1, showing that a TTI employee accompanied him on visit to a manufacturer, Ex. 4;

- an email from an employee at one of the domestic subsidiaries asking a TTI engineer to assist in redesign of packaging label, Ex. 5;

- an engineer change request form which identifies an Ryobi employee, <u>see</u> Ex. E, as providing "Manager Approval" and lists two TTI employees as receiving "Additional Notification," with one of these employees also approving the change, Ex. 9; and

- an email from a TTI employee to Ryobi employees raising possible intellectual property concerns regarding table saw, Ex. 10.

One email exchange in particular suggests that TTI shapes company policy to some extent. An executive at TTI initiated it by emailing two Ryobi employees for help "set[ting] some guidelines for what the company's position will be" for adapting to changes in the regulatory landscape. Ex. 12. His email explains that the need to develop "strategies moving forward" came up during "our marketing meeting last Friday." <u>Id.</u> In noting that two TTI employees are "trying to keep up to speed on the issues and are informing product management back in the U.S. as issues arise," the email further suggests that TTI collaborates with its domestic subsidiaries on marketing decisions. <u>Id.</u> Throughout the email, the TTI employee fails to distinguish between TTI and Ryobi, instead referring to "the company" as one unit. The email addresses table saws specifically, as it requests direction on "the integration and timing [of riving knives] into our table saw line up." <u>Id.</u> In response to this email, a Ryobi employee outlines the company's policy, as he sees it. <u>Id.</u> The employee also implies that Ryobi dictates policy, with TTI providing information where needed.

> We have been asking for 12 weeks now about what the cost difference for mounting the guard like the BTS10 (splitter) and the BTS14 (riveting knife). We want to know because it may be well worth the extra cost (if any) to have the guard mounted closer to the blade, and therefore more likely in line with the blade, and less likely to interfere with the work-place passing thru, blah blah bah. There is no question here of whether or not we have to use this feature – we are asking for the cost difference (continuously) because we may want to use this feature.

<u>Id.</u> TTI's role in marketing discussions may thus be limited to relaying information between the

domestic subsidiaries and the Asian manufacturers, including cost estimates and regulatory

concerns.  See id.  The passage suggests that the decision-making authority remains with the

domestic subsidiaries in the United States.  See id.

Indeed, there is no evidence in the record that TTI holds ultimate authority over design

and production decisions.  The proffered evidence instead shows that TTI sought authorization

from its domestic subsidiaries throughout the design and production process.  There is also

evidence that TTI employees took direction from and deferred to employees at these subsidiaries.

- an email from a Ryobi employee to a TTI employee listing design changes to table saw model that he "want[s] to implement . . . within the next 6 weeks" and requesting that the TTI employee ask its manufacturer to manage "inventory of stands and other unique parts carefully" during phase-out of model, Ex. D;

- an email from a TTI employee to a Ryobi employee stating that "[w]e are ready to get the mfg going once you have had a chance to review the attached [cost estimates]," Ex. E;

- an email from a Ryobi employee to employees at the domestic subsidiaries and TTI providing approval of modifications to saw model and directing them to "[p]lease proceed with moving forward with these changes immediately," Ex. E;

- an email from a TTI employee affirming that the change to splitter thickness of saw model "will not be implemented" in response to email from Ryobi employee that "[t]he splitter needs to remain at the current thickness" due to safety concerns, Ex. H ;

- an email from a TTI-NA engineer directing a TTI project manager to complete a series of tasks concerning the preparation of prototype of saw model, Ex. I, and a follow-up email from the TTI-NA engineer approving much of the prototype, Ex. J;

- an email from a TTI employee identifying open issues for saw model, including, *inter alia*, that input from Ryobi is needed before calculation of cost savings possible and that Ryobi has approved tooling cost and price increase of saw model, " Ex. 6;

- an email from a TTI employee asking Ryobi employees "what [they] would like to do" regarding proposed modifications to table saw and reminding them to "[k]eep in mind that the [timing and cost implications of these modifications] will be discussed with the vendor after [Ryobi's] approval," Ex. 7;

- an email from a Ryobi employee asking TTI employees to confirm whether "mak[ing] production" is possible if design change implemented, Ex. 10.

Several memorandum issued on Ryobi letterhead, with employees at TTI included on the distribution list, likewise show that Ryobi controlled the design process. Ex. A (Ryobi memorandum requiring "[i]mplementation of [certain] corrective actions . . . prior to production and shipment" of table saw prototype); Ex. B (Ryobi memorandum stating that table saw prototype has "completed all testing with no deficiencies"); Ex. C (Ryobi memorandum concluding that table saw "is ready for production" based on testing of prototype).

In its marketing materials, TTI presents itself as having a significance presence in the United States. A map in TTI's annual report for 2009 depicts the company as conducting sales and marketing, research and development, and manufacturing activities in the United States through various brands, including Ryboi. See Ex. P. The report highlights that TTI's sales in North America constitute seventy-six percent of its total sales. Id. The report also identifies several United States subsidiaries, including One World and TTI-NA, as "principal" subsidiaries. Id. at 137, 139. The principal place of business of TTI is Hong Kong, according to the report, but its "functional currency . . . is United States Dollars." Id. at 54. A press release issued after The Home Depot awarded TTI its "Partner of the Year" award in 2003 stated that "TTI is a leading and fast-growing supplier of home improvement products, employing over 16,000 people worldwide." Ex. R. The release features a quotation from TTI's Chairman and CEO which describes the award as "a tribute to all the TTI employees in the United States and worldwide." Id.

The extent of managerial control that TTI exercises in the United States is unclear from

the marketing materials.  The 2009 annual report includes the presidents[6] of various North

American entities in its list of "Global Senior Management."  Ex P, at 25.  These executives

manage entities ranging from TTI Power Tools to Milwaukee Tools.  Id.  The marketing materials

do not show that TTI controls these entities.  See id.  To the contrary, the report includes some of

the entities in its list of principal subsidiaries.  See id. at 25, 137.  The management list places

TTI's corporate leadership in a different column from its executives in North America.  Id. at 25.

The marketing materials connect TTI with the Ryobi name.  The 2009 annual report

describes Ryobi as one of TTI's "powerful brands."  Id.  A description of TTI on the United

States website for Ryobi likewise states that "TTI's powerful brand portfolio includes . . . Ryobi®

power tools and accessories, [and] Ryobi® . . . outdoor products . . . ."  Ex. Q.  The website

further explains that TTI's "products are distributed through major home centers and retailers,

full-line tool distributors and other channels worldwide."  Id.  See also Ex. O (nearly identical

statement on TTI's website also). TTI's press release announcing its award from Home Depot

states that "TTI designs and manufactures the Ryobi brand of power tools and accessories . . . ."

Ex. R.

RYOBI® is a registered trademark of an independent Japanese company, Ryobi Limited.

See Ex. K, at 222-23; Ex. T.  A license agreement with Ryobi Limited permits TTI to use the

Ryobi name.  Ex. K, at 222-23.  A majority of TTI's domestic subsidiaries' sales of table saws

over the last decade came from the sale of Ryobi-branded table saws.  See Ex. S.  None of these

subsidiaries own the Ryobi name, nor do any of them directly have the right use that name.  See

---

[6] While the opposition memorandum describes one of the executives listed as the
"current[] president of TTI-NA and One World Technologies," Document No. 26, at 9, the
Plaintiffs have proffered no evidence in support of this statement.

Ex. K, at 222-23; Ex. T (explaining that Ryobi name "is used by TTI and its subsidiaries pursuant to a license granted by Ryobi Limited"). The use of the Ryobi brand in the United States is thus an exercise of TTI's rights through the license agreement.

Ryobi saws injured the Plaintiffs in Massachusetts, Document No. 19-1, at 1-2,[7] with the Ryobi Model BTS 10 saw injuring Gao and Micheli and the Ryobi Model BTS 12 saw injuring Mazin. These saws are sold in the United States through The Home Depot exclusively. Ex. U, at 58, 201-02. The Home Depot has 1,976 retail stores throughout the country, including forty-five in Massachusetts. Ex. V, at 10. Massachusetts thus has approximately 2.25% of the stores in the United States. See id. Assuming each store in the United States sells the same number of table saws, TTI earns 2.25% of its transaction fees for ordering saws that The Home Depot ultimately sells in Massachusetts. Extrapolating from sales data from 2001 through 2010, The Home Depot likely sells thousands of Ryobi saws in Massachusetts each year, earning over a million dollars in revenue annually. See Ex. 17. There is no evidence that TTI arranged for its domestic subsidiaries to sell the saws to The Home Depot.

IV.    Discussion

A plaintiff cannot establish personal jurisdiction unless "jurisdiction is both statutorily authorized and consistent with the Constitution." Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 135 (1st Cir. 2006). "In determining whether a non-resident defendant is subject to its

---

[7] A demand letter attached to the Amended Complaint in Micheli states that the plaintiff was injured in Brockton, Massachusetts. Document No. 19-1, at 2. The plaintiffs in Gao and Mazin have not attached similar demand letters to their complaints, neither of which identifies the location of the injuries. Gao, Document No. 1; Mazin, Document No. 1. For the purposes of this motion, however, I will assume that the injuries also occurred in Massachusetts. In its briefing and at oral argument, TTI never objected to jurisdiction on the grounds that the injuries occurred elsewhere.

jurisdiction, a federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum state." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002) (quotation marks omitted). "The Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute as coextensive with the outer limits of the Constitution," Platten, 437 F.3d at 135, making it appropriate to "sidestep the statutory inquiry and proceed directly to the constitutional analysis." Daynard, 290 F.3d at 52. The question here is thus whether the exercise of personal jurisdiction over TTI comports with the Due Process Clause of the Fourteenth Amendment. Platten, 437 F.3d at 135.

Due Process requires the Plaintiffs to prove "the existence of either general or specific jurisdiction." Negron-Torres v. Verizon Commc'ns, Inc., 478 F.3d 19, 24 (1st Cir. 2007). Specific jurisdiction exists "over an out-of-state defendant where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." Id. (quotation marks omitted). A specific jurisdiction inquiry therefore "focuses on the cause of action, the defendant and the forum." Harlow v. Children's Hosp., 432 F.3d 50, 65 (1st Cir. 2005). In contrast, general jurisdiction is "dispute blind." Id. General jurisdiction exists if the defendant "engaged in continuous and systematic activity, unrelated to the suit, in the forum state." Negron-Torres, 478 F.3d at 25 (quotation marks omitted). For both types of personal jurisdiction, "[t]he critical factor in the personal jurisdiction calculus . . . is the existence of 'minimum contacts' between the nonresident defendant and the forum." Id. "[A] court asserting jurisdiction over a nonresident defendant must find that the defendant maintains sufficient contacts with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Id. (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

A.      Specific Jurisdiction

In resolving specific jurisdiction questions, the First Circuit "divides the constitutional analysis into three categories: relatedness, purposeful availment, and reasonableness." Platten, 437 F.2d at 135.  This three-step analysis proceeds as follows:

> First, an inquiring court must ask whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum. Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws. Third, if the proponent's case clears the first two hurdles, the court then must analyze the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction.

Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 288 (1st Cir. 1999).

1.      Relatedness

To demonstrate "relatedness," the Plaintiffs must show "a demonstrable nexus between [their] claims and [TTI's] forum-based activities, such . . . [that] the litigation itself is founded directly on those activities." Adelson v. Hanamel, 652 F.3d 75, 81 (1st Cir. 2011) (quotation marks omitted).  "[T]he relatedness test is a flexible, relaxed standard," which asks "whether the claim underlying the litigation . . . directly arise[s] out of, or relate[s] to, the defendant's forum-state activities." N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005) (quotation marks omitted).  The test falls between proximate and "but for" causation, with foreseeability shaping most relatedness determinations.  See Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 715-16 (1st Cir. 1996).

The Plaintiffs have shown a demonstrable nexus between the Plaintiffs' injuries in Massachusetts and TTI.  Through orders that it submitted to the Asian manufacturers on One

World's behalf, TTI placed Ryobi saws into the stream of commerce. Document No. 25-2, at ¶8. TTI paid the manufacturers for the saws, with One World immediately reimbursing TTI for the purchase and paying a transaction fee as well. Id. at ¶9. One World then distributes these saws to The Home Depot exclusively, Ex. U, at 58, 201-02, which has retail stores located throughout the United States, including forty-five stores in Massachusetts. Ex. V, at 10. The exclusive relationship between One World and The Home Depot makes it especially foreseeable that consumers in Massachusetts would ultimately purchase the saws. See Unicomp, Inc. v. Harcros Pigments, Inc., 994 F.Supp. 24, 25-26 (D.Me. 1998) (finding relatedness where manufacturer targeted forum through its choice of distributors). TTI ordered saws from Asian manufacturers that ultimately injured the Plaintiffs in Massachusetts. There is a sufficient nexus between the Plaintiffs' products liability actions and TTI's conduct to find relatedness.

Finding relatedness is by no means determinative of personal jurisdiction here. Indeed, "neither the Supreme Court nor the [First Circuit] has expressed concern about the causal link in cases analyzing the stream-of-commerce theory of personal jurisdiction." Id. at 26 (citing Asahi Metal Industry Co. v. Superior Court of Cal., 480 U.S. 102 (1987)). In stream-of-commerce cases, "the jurisdictional hitch [instead] comes from the requirement of purposeful availment." Id. See also J. McIntyre Mach., Ltd. v. Nicastro, 131 S.Ct. 2780, 2787 (2011) (plurality op.) (instructing the courts to focus on purposeful availment in products liability cases).

2.     Purposeful Availment

The purposeful availment test "focuses on the defendant's intentionality." U.S. v. Swiss Am. Bank, Ltd., 274 F.3d 610, 623 (1st Cir. 2001). A plaintiff "only satisfie[s] [this test] when the defendant purposefully and voluntarily directs his activities toward the forum so that he

should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." Id. at 624. Relying on Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. at 112, the First Circuit has refined the purposeful availment test where jurisdiction is premised on a stream-of-commerce theory. See Boit, 967 F.2d at 682-83. The plurality opinion in Asahi explained that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." Asahi Metal Indus. Co., 480 U.S. at 112. The opinion then introduced the "stream of commerce plus" standard, as courts in this circuit have described it. E.g., Newman v. European Aeronautic Def. & Space Co., 2011 WL 2413792, at *5 (D.Mass. June 16, 2011).

> Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

Asahi Metal Indus. Co., 480 U.S. at 112.

Following Asahi, the First Circuit first addressed the stream of commerce plus standard in Boit v. Gar-Tec Products, Inc., 967 F.2d at 683. In Boit, a power tool wholesaler sold a hot air gun to a national retailer that has an outlet in Maine and circulates mail order catalogs throughout the state. Id. at 675. The national retailer then sold the gun to a consumer in Maine, where it ultimately injured the plaintiff. Reasoning that "'mere awareness' that a product may end up in the forum state does not constitute 'purposeful availment,'" the First Circuit ruled that Maine lacked jurisdiction over the wholesaler. Id. at 683. The Supreme Court recently lent

support for this ruling in <u>J. McIntyre Machinery, Ltd. v. Nicastro</u>, 131 S.Ct. at 2792, where a British manufacturer sold scrap-metal machines in the United States through an independent distributor. The distributor sold four of these machines to New Jersey and one of them injured the plaintiff there. A divided court held that manufacturer had not purposefully availed itself of jurisdiction in New Jersey, with the concurring opinion requiring "'something more,' such as special state-related design, advertising, advice, marketing, or anything else." <u>Id.</u>

The Plaintiffs have failed to establish that TTI purposefully availed itself of jurisdiction in Massachusetts. There is no evidence of direct contact between TTI and Massachusetts. TTI is a Hong Kong corporation, with various independent subsidiaries in North America. Document No. 25-1, at ¶¶3, 6. TTI "does not lease or own any real or personal property located in Massachusetts." <u>Id.</u> at ¶4. Nor does it "have a Massachusetts telephone number, mailing address, bank account, or taxpayer identification number . . . [or] hold or maintain any Massachusetts licenses." <u>Id.</u> The Plaintiffs have not shown that TTI sells saws directly to Massachusetts, advertises in Massachusetts, has a registered agent in Massachusetts, owns property in Massachusetts, has ever paid Massachusetts taxes, or provides customer support in Massachusetts. Rather, TTI merely placed table saws into the stream of commerce that a third-party distributor, The Home Depot, ultimately sold to consumers in Massachusetts. <u>See</u> Document No. 25-2, at ¶8; Ex. U, at 58, 201-02. To haul TTI into court in Massachusetts, the Plaintiffs must satisfy the "stream of commerce plus" standard. <u>See</u> <u>Newman</u>, 2011 WL 2413792, at *5.

In search of a "plus" factor,[8] the Plaintiffs focus on TTI's relationships with its domestic

---

[8] The Plaintiffs have not couched their opposition in terms of the stream-of-commerce plus standard that applies in First Circuit. Nevertheless, the arguments that they present in

subsidiaries. One World sells Ryobi saws to The Home Depot, which then sells them at its retail stores. Ex. U, at 58, 201-02. Because The Home Depot has stores throughout the United States, including Massachusetts, the Plaintiffs argue that the relationships between these companies confer jurisdiction over TTI in Massachusetts. Document No. 26, at 14-16. In light of The Home Depot's significant presence in Massachusetts, through its retail stores and volume of sales there, the Plaintiffs argue that "[t]he Ryobi . . . saws at issue here were undoubtedly targeted at Massachusetts – TTI *knew* that the saws it helped design, manufacturer and distribute would be sold at Home Depot stores in the Commonwealth and *intended* those saws to be sold in the [forty-five] Home Depot[s] located there." Id. at 15-16 (emphasis in original). Absent "something more," this argument falls short. The relevant case law makes it clear that "mere awareness of a distribution network" is insufficient to establish purposeful availment under the stream of commerce plus standard. See Newman, 2011 WL 2413792, at *8. The Plaintiffs cannot satisfy the "stream of commerce plus" standard, without additional evidence that TTI established or controlled the distribution network here. Compare Amburgey v. Atomic Ski USA, Inc., 2007 WL 1464380, at *3 (D.Me. May 17, 2007) (finding that foreign manufacturer did not purposefully avail itself by shipping products to distributor, which has a network of independent dealers that covers forum state) with Unicomp, Inc., 994 F.Supp. at 27-28 (finding purposeful availment where manufacturer "carefully and knowingly" selected distributors with sales territories that covered forum state).

The Plaintiffs have proffered no evidence that TTI played any role in establishing the distribution network with The Home Depot. Nor is there evidence that TTI exercises control

---

support of purposeful availment follow this standard.

over it.  TTI simply serves as an intermediary between One World and TTI-NA and the Asian manufacturers.  The proffered evidence shows that TTI communicates with the Asian manufacturers and that the domestic subsidiaries communicate with The Home Depot.  See, e.g., Ex. 8.  The one email that the Plaintiffs use to show that TTI communicates with retailers directly is between employees at TTI and Sears, Roebuck and Co., not The Home Depot.  Ex. N.  TTI's awareness of a distribution network in the United States is insufficient to establish personal jurisdiction in Massachusetts under these circumstances.  "The test is not knowledge of the ultimate destination of the product, but whether the manufacturer has purposefully engaged in forum activities so it can reasonably expect to be haled into court there."  Dalmau Rodriguez v. Hughes Aircraft Co., 781 F.2d 9, 15 (1st Cir. 1986) (pre-Asahi case declining to subject helicopter manufacturer to jurisdiction in Puerto Rico, based on stream-of-commerce theory, where third-party arranged for sale of helicopters to police department there).

A recent case from this district is especially instructive.  In Newman v. European Aeronautic Def. & Space Co., 2011 WL at *1, the estates of several passengers killed in an airplane crash in Massachusetts sued the French manufacturer of the plane.  The French manufacturer had no direct contacts with Massachusetts.  Id. at *7  Through the distribution network of its sister company in North America, the plaintiffs nevertheless attempted to establish jurisdiction in Massachusetts.  Id.  A distribution agreement between this independent company and a distributor provided the distributor with an exclusive right to sell airplanes in Massachusetts.  Id.  Because the manufacturer was not a party to this agreement, the Court declined to confer jurisdiction over the manufacturer based on it.  Id.  The evidence here only demonstrates that The Home Depot is the exclusive retailer of Ryobi saws in the United States.

One World sells these saws to The Home Depot, and The Home Depot orders them from One World. To haul TTI into court in Massachusetts, the Plaintiffs must point to more than TTI's knowledge of One World's distribution arrangement with The Home Depot.

The Plaintiffs' search for a "plus" factor does not end with the domestic subsidiaries' distribution network. The Plaintiffs also argue that "[t]he use of the Ryobi brand in the United States is . . . an exercise of TTI's rights, whether directly or indirectly through its subsidiaries." Document No. 26, at 10. In support of this argument, the Plaintiffs have shown that TTI licenses the Ryobi trademark from Ryobi Limited. Ex. K, at 222-23. While the evidence is somewhat ambiguous, I also credit the Plaintiffs' showing that none of TTI's domestic subsidiaries have an independent right to use the name. Ex. K, at 222-23; Ex. T. This argument is nevertheless unavailing. The First Circuit has "held that the mere use of a trademark or logo does not suffice to demonstrate the existence of the requisite minimum contacts. " <u>Negron-Torres</u>, 478 F.3d at 26. That TTI permits its domestic subsidiaries to sell table saws with the Ryobi-brand name does not confer jurisdiction over TTI wherever these saws are sold. Significantly, there is no evidence that the licensing agreement between TTI and Ryobi Limited contains geographic limitations. If TTI had negotiated a license agreement that permitted it to use the Ryobi-brand in Massachusetts specifically, the use of the Ryobi name there may well constitute purposeful availment. But simply introducing a product into the stream-of-commerce that has intellectual property rights attached to it is insufficient. Indeed, finding otherwise would effectively confer jurisdiction over TTI in any jurisdiction where a retailer sells a Ryobi-branded product.

The Plaintiffs also argue that TTI is intimately involved in the design of table saws sold in the United States. Document No. 26, at 6-8. The Plaintiffs stretch the evidentiary record in doing

so. While the Plaintiffs have shown that TTI facilitated the exchange of design communications between its domestic subsidiaries and the manufacturers, the proffered evidence stops short of demonstrating that TTI played a significant role in actually designing the saws. Rather, the emails produced show that TTI helped the domestic subsidiaries assess the financial impact of such design changes, through costs estimates and inventory management. Several of the emails demonstrate that TTI employees deferred to the employees at the domestic subsidiaries on design questions. There is no evidence that TTI controlled the design process. Moreover, even if the evidence showed that TTI designed saws for the United States market, TTI would not purposefully avail itself to suit in Massachusetts through such efforts. The Plaintiffs have introduced no evidence, nor argued, that the table saws were designed to serve the Massachusetts market specifically. See Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 85 (1st Cir. 1997) (rejecting argument that tire rim manufacturer subjected itself to personal jurisdiction in Puerto Rico, an island lined with beaches, by designing rim for use on sand).

Finally, the Plaintiffs argue that TTI has purposefully availed itself of jurisdiction in Massachusetts by contracting the services of The Home Depot to serve as its sale agent there. Document No. 26, at 15. The Plaintiffs assert that The Home Depot, as "the exclusive agent through which TTI sells its Ryobi-. . . branded saws in the United States, has clearly agreed to act in such a capacity." Id. The proffered evidence by no means supports such a conclusion. There is no evidence of any agreement between TTI and The Home Depot. As explained above, The Home Depot acts as a distributor for TTI's domestic subsidiaries. Furthermore, it is questionable if the Plaintiffs could even assert jurisdiction over the domestic subsidiaries on these grounds. While Asahi does identify the marketing of a product "through a distributor who has agreed to

serve as the sales agent in the forum State" as a plus factor, <u>Asahi Metal Indus. Co.</u>, 480 U.S. at 112, there is no evidence that the The Home Depot is an agent of the domestic subsidiaries. "An agency relationship would exist only if [the domestic subsidiaries] had manifested [their] assent to have [The Home Depot] act on its behalf and subject to its control." <u>Carreras v. PMG Collins, LLC</u>, 660 F.3d 549, 556 (1st Cir. 2011). Selling table saws to The Home Depot for resale to consumers falls short of establishing such a relationship.

      3.     Reasonableness

Because I conclude that TTI has not purposefully availed itself of jurisdiction in Massachusetts, I need not address the overall reasonableness of exercising jurisdiction. <u>Phillips Exeter Acad.</u>, 196 F.3d at 288, 292 (declining to address reasonableness where no purposeful availment). "An affirmative finding on each of the three elements of the test [, i.e. relatedness, purposeful availment, and reasonableness] is required to support a finding of specific jurisdiction." <u>Id.</u>

      B.     General Jurisdiction

To exercise general jurisdiction over TTI, the Plaintiffs must demonstrate that TTI's "affiliations with [Massachusetts] are so 'continuous and systematic' as to render [it] essentially at home" there. <u>Goodyear v. Dunlop Tires Operations, S.A. v. Brown</u>, 131 S.Ct. 2846, 2851 (2011). The Plaintiffs also must satisfy purposefulness and reasonableness requirements, just as with specific jurisdiction. <u>Cossaboon</u>, 600 F.3d at 32. The scope of the jurisdictional inquiry expands to include all contacts with Massachusetts, regardless of their relationship to the litigation. <u>See</u> <u>Negron-Torres</u>, 478 F.3d at 25-26. However, "[t]he standard for evaluating whether [defendants' alleged] contacts satisfy the constitutional general jurisdiction test is

considerably more stringent than that applied to specific jurisdiction questions." Platten, 437

F.3d at 138 (quoting Noonan v. Winston Co., 135 F.3d 85, 93 (1st Cir. 1998) (quotation marks

omitted). In this case, the general jurisdiction and specific jurisdiction inquires overlap

significantly because much of the proffered evidence relates to the design and distribution of the

table saws that injured the Plaintiffs. For the reasons discussed above, this evidence does not

establish that TTI purposefully availed itself of jurisdiction in Massachusetts for specific

jurisdiction purposes. The evidence likewise falls short under the more stringent test applied in

general jurisdiction cases.

   The Plaintiffs attempt to establish jurisdiction through TTI's marketing materials and

customer interactions. The Plaintiffs argue that, through its annual report and website, TTI

presents itself to the world as a company with operations, employees, and sales in the United

States. Document No. 26, at 9-10. The Plaintiffs have not framed these arguments in specific or

general jurisdiction terms. See id. Because the proffered marketing materials and customer

interactions are unrelated to their causes of action, these arguments would support a finding of

general jurisdiction, if accepted. However, the proffered evidence is insufficient to establish

personal jurisdiction over TTI in Massachusetts. Significantly, none of the evidence relates to

Massachusetts specifically. There is no evidence that TTI issued marketing materials targeted at

Massachusetts. Nor is there evidence that TTI interacted with customers in Massachusetts. At

best, the evidence establishes general, national marketing. See, e.g., Ex. P (depicting TTI as

conducting sales and marketing activities throughout North America). The law is clear that

personal jurisdiction requires conduct directed at a specific state, rather than the nation as a

whole. See Swiss Am. Bank, Ltd., 274 F.3d at 618 (explaining that minimum contact analysis in

diversity cases is specific to each state). Even assuming that the Plaintiffs overcame this jurisdictional bar, the Plaintiffs have not shown that the marketing materials present TTI as doing substantial business in the United States or that TTI interacts with customers in the United States on a regular basis.

The Plaintiffs argue that TTI's marketing materials present the company as "a global multinational that does substantial business in the United States." Document No. 26, at 9. These materials fall short of showing that TTI, as an entity, presents itself as doing business does business in the United States. See Ex. O; Ex. P; Ex. Q. Instead, the materials present TTI as the parent company of various subsidiaries, some of which do business in the United States. The annual report from 2009 makes it clear that, while TTI is incorporated in the Hong Kong, it has subsidiaries that are incorporated in the United States. Ex. P, at 136-39. The section of this report entitled "Global Senior Management" further demonstrates the derivative nature of TTI's presence in the United States by listing its corporate leadership separately from the leadership of various regions, including North and South America. Id. at 25. In contrast to its corporate leadership, the executive for each region has a subsidiary or division listed underneath his or her name. Id. TTI also suggests that its global reach is derivative by explaining, on its website, that its "products are distributed through major home centers and retailers, full-line tool distributors and other channels worldwide." Ex. O. Moreover, even if the marketing materials presented TTI and its subsidiaries as one company, this portrayal would not confer jurisdiction over TTI in Massachusetts, without more. See Barrett v. H&R Block, Inc., 652 F.Supp.2d 104, 115 (D.Mass. 2009) (rejecting "the proposition that a company may waive any claim of corporate independence by merely collectively referring to itself and its subsidiaries in public filings").

The Plaintiffs' argument that TTI's interactions with customers in the United States also lacks sufficient factual support. Document No. 26, at 8-9. The Plaintiffs have not shown that TTI interacted with United States customers with sufficient regularity to constitute "continuous and systematic activity." While Plaintiffs have shown that, in one instance, an engineer at Sears, Roebuck & Co. emailed TTI directly regarding a design question, see Ex. N., this sole email in support stops far short of demonstrating that such communications occur regularly. There is also no evidence that the engineer that emailed TTI resided in Massachusetts. See id.

In arguing that I should impute the contacts of its domestics subsidiaries to TTI, the Plaintiffs add an additional layer to this general jurisdictional inquiry. Document No. 26, at 11-12. The Plaintiffs assert that these "subsidiaries are 'alter-egos' of TTI or corporate shams . . . [and that they also] acted as its agent or instrumentality." Id. These arguments seek to overcome "[t]he principal of limited liability [, which] is one of the hallmarks of corporate law." Negron-Torres, 478 F.3d at 25. The First Circuit has recognized that the bar is set especially high for cases "in which plaintiffs seek to disregard the corporate form." Platten, 437 F.3d at 139. "The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary." Id. "[T]here is invariably a 'plus' factor-something beyond the subsidiary's mere presence within the bosom of the corporate family," including an alter ego or an agency relationship, as alleged here. Donatelli v. Nat. Hockey League, 893 F.2d 459, 465-66 (1st Cir. 1990).

The Plaintiffs' efforts to circumvent TTI's corporate form fall short. To assert jurisdiction based on an alter ego theory, the Plaintiffs must show that TTI "has ignored the corporate independence of the subsidiary by using the subsidiary as a sham proxy to conduct its own

business." In re Lupron Mktg. and Sales Practices Litig., 245 F.Supp.2d 280, 299 (D.Mass. 2003)

(applying Massachusetts law). The evidence in the record in no way supports such a finding. To

the contrary, several email exchanges suggest that TTI's employees seek authorization from

employees at its domestic subsidiaries throughout the design and production process. There is also

evidence that TTI employees took direction from and deferred to employees at these subsidiaries.

The domestic subsidiaries are not sham proxies for TTI. Nor is there evidence that piercing the

corporate veil is necessary to "defeat fraud or to remedy injustice," as required by Massachusetts

law. Harrelson v. Seung Heun Lee, 798 F.Supp.2d 310, 315 (D.Mass. 2011). Rather, TTI has

submitted an affidavit from an executive at One World that attests that the subsidiary has

independent assets and insurance coverage sufficient to satisfy its operating obligations and

withstand an adverse judgment in these cases.[9]  Document No. 25-2, at ¶5.

    The Plaintiffs also allege that the domestic subsidiaries constitute agents or

instrumentalities of TTI. "An agency relationship is created [under Massachusetts law] when there

is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the

principal, and subject to the principal's control." Theos & Sons, Inc. v. Mack Trucks, Inc., 431

Mass. 736, 742 (2000). See also Mercier v. Clark, 2000 WL 1375583, at *2 (D.Mass. Sept. 21,

2000) (requiring authorization and control for jurisdictional purposes also). While some evidence

suggests that TTI acts as an agent of its domestic subsidiaries, through its placement of orders with

---

[9] In their oppositions, the Plaintiffs assert that TTI-NA and One World each have a
market capitalization of ten dollars. The Plaintiffs base this figure on TTI's 2009 Annual
Report, which lists the "issued and fully paid share capital" of One World and TTI-NA at ten
dollars. I do not credit this evidence as demonstrating that these subsidiaries are
undercapitalized. As TTI points out, see Document No. 53, at 8-9, "issued and fully paid share
capital" is a corporate finance concept that is based on the arbitrarily assigned par value of the
stocks, not their actual value.

Asian manufacturers on their behalf, there is no evidence that the subsidiaries act at the direction of TTI.  See Document No. 25-2, at ¶7-8 (explaining that One World originates orders for TTI to place with Asian manufacturers).  Because the Plaintiffs have failed to show that TTI controls its domestic subsidiaries, the Plaintiffs likewise cannot assert jurisdiction based on instrumentality theory.  That TTI is the parent company for both One World and TTI-NA is insufficient to create jurisdiction over TTI in Massachusetts.  See Andresen v. Diorio, 349 F.3d 8, 12 (1st Cir. 2003) (emphasizing that "a separately managed company is a separate entity" for jurisdictional purposes).

IV.    Conclusion

For the foregoing reasons, I recommend that Techtronic Industries, Co.'s motion to dismiss for lack of personal jurisdiction be granted.[10]

_____/s / Leo T. Sorokin_____
Leo T. Sorokin
Chief United States Magistrate Judge

---

[10]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health and Human Services, 848 F.2d 271 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140 (1985).